## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | **Hon. Anita B. Brody** |
| *Martin v. Kansas City Chiefs Football Club, LLC* | No. 14-3381 |
| *Lewis et al. v. Kansas City Chiefs Football Club, Inc.* | No. 14-1995 |

January 3, 2019                                                    Anita B. Brody, J.


### MEMORANDUM

Defendant the Kansas City Chiefs Football Club, Inc. (the "Chiefs") moves to dismiss the

Complaint filed by Plaintiff Anita Martin ("Martin") in *Martin v. Kansas City Chiefs Football*

*Club, LLC*, No 14-cv-3381 (E.D. Pa.) ("*Martin*") (ECF No. 1-1) and *Lewis v. Kansas City Chiefs*

*Football Club, LLC*, No. 14-cv-1995 ("*Lewis*"), and the Short Form Complaint filed by Martin in

*Martin* (ECF No. 4) and *In re: National Football League Players Concussion Injury Litigation*,

12-md-2323 (E.D. Pa.) ("*NFL Concussion MDL*") (ECF No. 8171). Martin was previously

married to Christopher Martin, a former player for the Chiefs, and brings a claim against the

Chiefs for loss of consortium related to head injuries her ex-husband sustained while playing for

the Chiefs. The Chiefs contend that Martin's claim should be dismissed because she is a class

member in the NFL Concussion Settlement (the "Settlement") and did not opt out of the class.

Consequently, her claim is precluded by the Settlement. Martin contends that, because she

1

informally opted out of the class, her claim is not precluded. In the alternative, Martin moves to now opt out of the Settlement. I will decide both motions as follows.[1]

## I.    BACKGROUND

### A.  The NFL Head Concussion MDL

In July 2011, retired football players began filing lawsuits against the National Football League, the NFL Properties (LLC), and individual NFL teams (collectively, the "NFL Defendants"). These suits alleged, among other things, that the NFL Defendants breached their duties to the players by failing to take reasonable actions to protect players from the chronic risks created by concussive and sub-concussive head injuries and that the NFL Parties concealed those risks from those players. Since that time, more than 5,000 former players and their family members have filed over 300 substantially similar lawsuits. These lawsuits have been consolidated before me as a multidistrict litigation ("NFL Concussion MDL"), pursuant to 28 U.S.C. § 1407. *See* MDL Panel Transfer Order, Jan. 31, 2012, ECF No.1 (*NFL Concussion MDL*).

### B.  The Class Action Settlement

On July 7, 2014, I entered an order granting preliminary approval of the Settlement between the NFL Defendants and a proposed Settlement Class. Order ¶¶ 2(a), ECF No. 6084 (*NFL Concussion MDL*). The proposed Class consisted of:

> All living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order [July 7, 2014], retired, formally or informally, from playing professional football with the NFL or any Member Club . . . ('Retired NFL Football Player'); . . . and [s]pouses parents, children who are dependents, or any

---

[1] I may consider the Chiefs' Motion to Dismiss on claim preclusion grounds before I consider Martin's motion to remand. While "a federal court may not rule on the merits of an action without first ascertaining whether it has subject matter jurisdiction to do so[,]" dismissing a case on claim preclusion grounds is "not technically a judgment on the merits." *Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 276 (3d Cir. 2016) (citing *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948)).

other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player ('Derivative Claimants').[2]

Settlement Agreement §§ 1.1, 2.1, ECF No. 6481-1 (*NFL Concussion MDL*).

The Settlement contained a broad release of claims by Class Members against the NFL Defendants. Each Class Member released any claims against the NFL Defendants, including individual NFL teams, that "could have been asserted in the Class Action Complaint or any other Related lawsuit." Settlement Agreement § 18.1(a). The Settlement explicitly released, among others, claims "arising out of, or relating to, head, brain, and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events;" claims "arising out of, or relating to, CTE [Chronic Traumatic Encephalopathy]"; and claims "arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations." Settlement §§ 18.1(a)(ii)-(iv).[3]

The preliminary approval order also directed the implementation of the notice program proposed by the parties. The notice program informed Class Members of their rights under the Settlement and told them that if they did not affirmatively opt out of the Settlement by October 14, 2014, they would be bound by the Settlement's release. Class Members had approximately 90 days to decide whether to opt out.

The Settlement Agreement gave the NFL Defendants the option of terminating the Agreement at any time, and for any reason, during the period between when the list of timely

---

[2] Martin is a Derivative Claimant. *See infra* Section III(A)(1).

[3] This release was expressly incorporated into the Final Order and Judgment approving the Settlement. *See In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 425 (E.D. Pa. 2015).

opt-outs was released and when the Court issued final approval of the Settlement. Settlement §
16.1 The NFL Defendants did not exercise this option.

On April 22, 2015 (as amended on May 8, 2015), I issued a Final Order and Judgment
approving the Settlement and certifying the Settlement Class. I found that the notice program
complied with both Rule 23 and due process. *See In re NFL Players' Concussion Injury Litig.*,
307 F.R.D. 351, 383-86 (E.D. Pa. 2015) (finding that the Long-Form Notice "was written in
plain and straightforward language" and "apprised all Class Members of . . . the opportunity to
opt out the Settlement; and the binding effect of a class judgment on Class Members"). The
Third Circuit affirmed the Final Order and Judgment, including my finding that the notice
program complied with both Rule 23 and due process requirements. *See In re NFL Players'
Concussion Injury Litig.*, 821 F.3d 410, 535-36 (3d Cir. 2016) (observing that "[t]he notice . . .
outlined the rights of players to . . . potentially opt out. If a retired player chose to opt out, he
would not benefit from the settlement but would not release his claims against the NFL.").

### C. The Settlement's Notice Program

The notice program included direct individual notice to identifiable Retired NFL Football
Players and their heirs and paid publication in various media sources.  The Notice was publicized
through full-page advertisements in *Ebony, People, Sports Illustrated,* and *Time*; thirty-second
television commercials on ABC, CBS, CNN, and other television stations; and ads on popular
internet sites. The Claims Administrator also established a Settlement Website containing links
to the Long-Form Notice and the Settlement and providing answers to frequently asked
questions. Plaintiffs' notice expert estimated that this plan would reach approximately 90% of
Class Members. Additionally, the formal notice program was supplemented by the extensive
news coverage of the NFL concussion litigation and the Settlement.

Both a Long-Form Notice and Summary Notice were distributed, and both were written in plain and straightforward language. The Notices explicitly stated that Derivative Claimants were included in the Settlement Class. *See* Summary Notice at 1 ("The Settlement Class includes immediate family members of retired players . . . ."); Long-Form Notice at 8 ("This Settlement Class includes  . . . Derivative Claimants," defined as "any . . . persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a . . . Retired NFL Football Player.").

Among other things, the notice program informed class members that if they did not individually opt out of the Settlement before the deadline (October 14, 2014), they would lose their right to sue the NFL Parties. *See, e.g.,* Summary Notice at 1 ("All Settlement Class members will be bound by the Settlement and give up the right to sue the NFL individually. If you want to keep your right to sue the NFL, you must exclude yourself from the class by **October 14, 2014**."); Long-Form Notice at 2 ("[opting out] is the only option that allows you to participate in any other lawsuit against the NFL Parties about the claims in this case . . . ."); Long-Form Notice at 19 ("if you want to retain the right to sue the NLF Parties about the legal issues in this case, then you must take steps to remove yourself form the Settlement. You may do this by asking to be excluded from—opting out—of the Settlement Class."); Long Form Notice at 20 ("Unless you exclude yourself (opt out), you give up the right to sue the NFL Parties for all of the claims that this Settlement resolves. If you want to maintain your own lawsuit relating to the claims released by the Settlement, then you must exclude yourself (opt out) on or before **October 14, 2014**.")

The Notice materials repeatedly directed readers to sources that could answer any questions they had about the Settlement. Both the Summary Notice and the Long-Form Notice

contained a banner at the bottom of each page instructing those with "Questions?" to call a toll-free support number or visit the Settlement Website. The Long-Form Notice also included five warnings that the Long-Form Notice was only a summary, and that readers should look to the Settlement for specific details. *See* Long-Form Notice at 2, 6, 7, 15, 19 ("This Notice is only a summary of the Settlement Agreement and your rights. You are encouraged to carefully review the complete Settlement Agreement [on the Settlement Website]."). Finally, the Long-Form Notice included contact information for class counsel. *See* Long-Form Notice at 23.

### D. Martin's Litigation Against the Chiefs

Martin was married to Christopher Martin,[4] a retired NFL football player, from 1986 to 2006. Short Form Compl., Attach. A ¶ 43, ECF No. 4 (*Martin*). From 1988 to 1993, Christopher Martin played for the Chiefs. *Id.* at ¶ 1. In January 2014, Martin filed a lawsuit against the Chiefs in Missouri state court. Martin's suit alleged that her ex-husband "suffered multiple concussive and sub-concussive injuries," that "Defendant's wrongful conduct . . . directly cased [sic] or directly contributed to cause Mr. Martin to develop post-concussion syndrome and latent brain disease, including . . . Chronic Traumatic Encephalopathy," and that "[a]s a result of Defendant's wrongful conduct and resulting injuries to Mr. Martin, [Anita Martin] suffered a loss of consortium." State Ct. Compl. at ¶¶ 2-4, ECF No. 1-1 (*Martin*).

The Chiefs timely removed Martin's lawsuit to the District Court for the Western District of Missouri. ECF No. 1-1 (*Martin*)**.** On March 13, 2014, the U.S. District Court for the Western District of Missouri consolidated her action with the action brought against the Chiefs by Christopher Martin and other retired Chiefs players. Order at 2, ECF No. 1-2 (*Martin*). On June 29, 2014, the Judicial Panel on Multidistrict Litigation transferred both actions to this Court as

---

[4] Plaintiff Anita Martin is referred to as "Martin." Plaintiff's former husband is referred to as "Christopher Martin."

part of the NFL Concussion MDL, finding that the actions shared numerous questions of law and fact with those already pending in the MDL. *See* Order at 1, ECF No. 625 (*NFL Concussion MDL*).

Christopher Martin timely opted out of the Settlement. *See* NFL Concussion Settlement: Opt Out Report, Ex. 1 at 5, (Nov. 3, 2014), ECF No. 6340-1 (*NFL Concussion MDL*) (listing timely opt outs).) Martin did not timely opt out and, before her present motion, made no other request to opt out of the Settlement. On November 3, 2014, the Settlement Claim Administrator filed the list of Class Members who had timely and effectively opted out of the Settlement. *See id.* This list was available on ECF and on the publicly accessible Settlement website. *See Opt Out Information*, NFL Concussion Settlement, https://www.nflconcussionsettlement.com/ Opt_Out_Information.aspx.

In 2017, nearly three years after the opt-out period ended, Martin took three additional actions against the Chiefs: (1) her counsel participated by phone in a March 27, 2017 opt-out organizational meeting; (2) she responded to the Court's Order that all opt-outs should file a Short Form Complaint by filing a Short Form Complaint on July 27, 2017; and (3) she submitted a court filing purporting to join the motion to remand filed by her ex-husband and the other plaintiffs in the *Chiefs* litigation on July 27, 2017.

## II.   LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to determine the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must engage in the following analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). Thus, a court may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    DISCUSSION

The Chiefs argue that Martin's claims should be dismissed because she is a Settlement Class Member who failed to timely opt out, and thus her claims are precluded by the Settlement. Martin argues that she "effectively" opted out and, in the alternative, that she should be allowed to opt out now because her failure to timely opt out was due to excusable neglect.

### A. **Martin is a Settlement Class Member Who Did Not Opt Out**

All Class Members who did not timely opt out of the Settlement are bound by its terms, including the release of claims against the NFL Defendants. Martin concedes that she did not formally opt-out of the Settlement before the deadline, but asserts that she "effectively" opted out.

#### 1. **Martin is a Settlement Class Member**

The Settlement Agreement defines the Settlement Class as "all Retired NFL Football Players, Representative Claimants and Derivative Claimants" who do not "timely and properly exercise the right to be excluded from the Settlement Class." Settlement Agreement §§ 1.1(a-b). "Retired NFL Football Players" encompasses "all living NFL Football Players who, prior to July 7, 2014, "retired . . . from playing professional football with the NFL or any Member Club." *Id.* § 2.1(ffff). The Settlement defines "Derivative Claimants" as "spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player . . . ." Settlement Agreement § 2.1(ee). Martin is a Derivative Claimant because she has a claim against the Chiefs under applicable state law "by reason of [her] relationship with a Retired NFL Football Player." [5] Christopher Martin, Martin's ex-husband, is a Retired NFL

---

[5] When Martin filed her claim in Missouri state court, she properly under applicable state law asserted a right to sue the Chiefs by reason of her relationship with Christopher Martin. This right was properly asserted because, under Missouri law, a party may bring a claim for loss of consortium based on injuries to their former spouse after the marriage has ended. Divorce limits the period for which damages may be recovered, but does not bar the claim. *See Richardson v. Volkswagenwerk, A.G.*, 552 F. Supp. 73, 87–88 (W.D. Mo. 1982) (citing *Hodges v. Johnson,* 417 S.W.2d 685, 693 (Mo. App. 1967)) (allowing a loss of consortium claim based on injuries to the plaintiff's ex-spouse, but limiting damages to those accrued during the term of the marriage). *Cf.* Restatement (Second) of Torts § 693 cmt. h (Am Law Inst. 1977) (noting that annulment of a marriage does not bar a loss of consortium action for injuries sustained during the marriage).

Football Player under the definition of the Settlement because he stopped playing professional football after 1993. Martin's loss of consortium claim exists by reason of her former marriage to Christopher Martin while he played for the Chiefs. Therefore, Martin is a Derivative Claimant and, unless she timely and effectively opted out of the Settlement, is a Settlement Class Member.

## 2. Martin Was Not Exempt from the Requirement to Individually Opt Out

First, Martin argues that her ex-husband, Christopher Martin's, act of opting out of the Settlement "had the effect of opting out [Martin's] claim." Pl.'s Opp. at 4-5. This is incorrect. The right to opt out of a class action is one that must be exercised individually. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998). *See also* William Rubenstein et al., *Newberg on Class Actions* §9:49 (5th ed. 2013) ("The right to opt out in a Rule 23(b)(3) class action is considered an *individual* right."); *Sloan v. Winn Dixie Raleigh, Inc.*, 25 F. App'x 197, 198 (4th Cir. 2002) (finding that a class representative could not opt out on behalf of individual class members). Indeed, to allow a class representative, counsel, or other individual to opt out on behalf of other class members would "infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members." *Hanlon*, 150 F.3d at 1024 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-77 (1974)).

The Settlement Agreement and the Summary and Long-Form Notices, approved by this Court and the Third Circuit, clearly communicated that each class member was required to *individually* opt out in order to continue pursuing claims against the NFL parties. *See, e.g.,* Summary Notice at 1 ("If *you* want to keep your right to sue the NFL, *you* must exclude *yourself* from the Class . . . .") (emphasis added); Long-Form Notice at 19 ("[I]f *you* want to retain the right to sue the NLF Parties about the legal issues in this case, then *you* must take steps to

remove *yourself* form the Settlement.") (emphasis added); Long Form Notice at 20 ("If *you* want to maintain *your own* lawsuit relating to the claims released by the Settlement, then *you* must exclude *yourself* (opt out) . . . .") (emphasis added).

Nothing in the Settlement Agreement, this Court's opinion approving the Settlement, or the Notices suggests that the opt-out right did not need to be exercised by *each individual* Class Member, or that any Class Member's opt out could have had the effect of opting out any other Class Member.

The fact that Martin's claim was consolidated with her ex-husband's claim does not alter this fundamental principle of class action law. As the U.S. District Court for the Western District of Missouri noted in its order consolidating Anita and Christopher Martin's claims against the Chiefs, "consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties[.]" Order at 2, ECF No. 1-2 (*Martin*) (quoting *Enter. Bank v. Saettele*, 21 F.3d 233, 235 (8th Cir. 1994)). Indeed, to allow Christopher Martin to opt out on Martin's behalf—merely because a court consolidated their claims in a single action in furtherance of judicial administration—would infringe upon Martin's due process rights. [6] Christopher Martin's opt-out did not have the effect of opting out Martin.

---

[6] While it is true that Martin cannot recover under the Settlement Agreement because her ex-husband chose to opt out of the Settlement Agreement, this fact has no bearing on Martin's status as a Class Member or the opt-out requirement. Any Class Member who did not wish to be bound by the terms of the Settlement—including the limitations on when Derivative Claimants could recover—was free to opt out by the deadline and pursue his or her own litigation against the NFL Defendants.

### 3. Martin Did Not "Effectively" Opt Out

A party who fails to timely file an opt out form may be found to have effectively opted out if there is a "'reasonable indication' of a party's intent to opt out." *In re Linerboard Antitrust Litig.,* 223 F.R.D. 357, 365 (E.D. Pa. 2004) (quoting *In re Four Seasons Secs. Laws Litig.*, 493 F.2d 1288, 1291 (10th Cir. 1974)). *See also Plummer v. Chem. Bank*, 668 F.2d 654, 657 n.2 (2d Cir. 1982) ("Any reasonable indication of a desire to opt out should suffice."). "In order for a party to give a 'reasonable indication' of its intent to opt out, the party must perform some action that is unambiguously inconsistent with an intention to participate in the settlement." *In re Processed Egg Prods. Antitrust Litig.*, 130 F. Supp. 3d 945, 952 (E.D. Pa. 2015). This action must take place during the opt-out period. *See In re Deepwater Horizon*, 819 F.3d 190, 196 (5th Cir. 2016) (refusing to consider post-opt-out period conduct in determining whether a class member had informally opted out).

Merely continuing to maintain a lawsuit filed *before* the opt-out period is not a reasonable indication of a desire to opt out.[7] *See In re Processed Egg Prods.*, 130 F. Supp. 3d at 953 n.11 (observing that "prosecuting an already pending lawsuit during an opt-out period is not so clearly a rejection of the settlement" as is instituting a *new* lawsuit during the opt-out period). *See also* William Rubenstein et al., *Newberg on Class Actions* §9:46 (5th ed. 2013) ("Most courts hold that pending parallel litigation is ___not___ sufficient to communicate an opt-out request"); *Sloan*, 25 F. App'x at 198 (finding that merely maintaining an existing lawsuit, as opposed to filing a new lawsuit, during the opt out period was inadequate notice of an intent to opt out); *In re WorldCcom, Inc. Sec. Litig.*, No. 02 CIV. 3288 (DLC), 2005 WL 1048073, at *3 (S.D.N.Y. May

---

[7] The cases cited by Martin are not to the contrary. Martin relies on *In re Four Seasons Securities Laws Litigation*, 493 F.2d 1288 (10th Cir. 1974), and *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62 (N.D. Cal. 1976), both of which addressed whether a class member who took certain actions *during the opt-out period* had made a reasonable indication of his or her intent to opt-out.

5, 2005) ("It is undisputed that pursuing an individual action or arbitration does not constitute notice of an election to opt out of a class action."); *Holmes v. CSX Transp.*, No. Civ.A. 97-3863, 1999 WL 447087, at *4 (E.D. La. June 24, 1999) ("Simply continuing with the present law suit [sic] . . . is not sufficient to provide the court with notice of plaintiff's intent to opt out of the class.").

Martin did not evince a reasonable indication of her desire to opt out during the opt-out period. The sole action she took during the opt-out period was continuing to maintain her pending lawsuit against the Chiefs. The only other actions Martin puts forth as evidence of her intent to opt out—her counsel's participation in an opt-out organizational meeting, her filing of a Short-Form Complaint, and her filing purporting to join Christopher Martin's motion to remand—occurred between March and July 2017, years after the opt-out period ended on October 14, 2014. These actions have no bearing on whether Martin intended to opt out during the opt-out period. Without some action taken during the opt-out period, this cannot serve as an after-the-fact indication that she had intended to opt out nearly three years prior.[8]

**B.**  **Martin's Failure to Opt Out of the Settlement Was Not Due to Excusable Neglect**

Martin argues that, if this Court finds she did not effectively opt out, the Court should grant her leave to opt out now, four years after the opt-out deadline. Because Martin's failure to timely opt out was not due to excusable neglect, the Court will deny this request.

Four factors are considered in evaluating whether a party's failure to timely opt out was due to excusable neglect: "1) the danger of prejudice to the nonmovant; 2) the length of the delay

---

[8] Martin also suggests that this Court "understood [Martin] to have opted out" because I granted a request by her counsel to appear telephonically at an organizational meeting of all opt-out plaintiffs. Pl.'s Opp. at 4. Granting this request was an administrative decision based on Martin's representation to the Court that she was an opt-out plaintiff, and was in no way a legal finding that Martin had effectively opted out of the Settlement.

and its potential effect on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the movant; and 4) whether the movant acted in good faith." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 322-23 (3d Cir. 2001) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship et al.*, 507 U.S. 380, 395 (1993)). In determining "whether a party's neglect of a deadline is excusable . . . the determination is at the bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395.

### 1. Prejudice to Defendant

The Chiefs argues that it would be prejudiced if the Court allowed Martin to opt out now, because this would undermine its reliance on the certainty provided by the Settlement and the opt-out deadline. Because the Chiefs would be prejudiced, this factor weighs against a finding of excusable neglect.

First, allowing a class member whose request is "neither unique nor compelling" to opt out after the deadline may prejudice defendants by opening the door to other requests for untimely opt-outs. *In re Diet Drugs Prods. Liab. Litig.*, 92 F. App'x 890, 894 (3d Cir. 2004). *See also In re Imprelis Herbicide Mktg., Sales Practices and Prods. Liab. Litig.*, Nos. 11-md-02884, 2:11-cv-7599, 2014 WL 348593, at *4 (E.D. Pa. Jan. 31, 2014) (finding prejudice based in part on "the potential for future requests from similarly situated class members"); *In re Diet Drugs Prods. Liab. Litig.*, No. 99-20593, 2007 WL 4082994, at *4 (E.D. Pa. Nov. 15, 2007) ("Allowing plaintiff to opt out in this case would open the floodgates for similar motions by other class members who had pending cases but failed to opt out by the relevant deadline.").

Here, Martin's request presents nothing that is unique or compelling. Martin's position—a class member who had pending litigation against the NFL Parties at the time of the settlement

and failed to timely opt out—is one that many other class members also potentially share. Before the Settlement was preliminarily approved, about 5,000 former players and their family members had filed over 300 substantially similar lawsuits against the NFL Parties. Only 220 Settlement Class Members submitted timely opt-out requests. There are potentially thousands of Class Members who had claims pending against the NFL Parties at the time of the Settlement, failed to timely opt out, and now may be rethinking that decision, four years after the opt-out deadline.[9]

Second, allowing additional opt-outs at this late date would further prejudice the Chiefs and the other NFL Parties because they relied on the guarantee that they would know the number of opt-outs by a certain date when they agreed to the Settlement. Recognizing this, the Settlement Agreement gave the NFL parties "the absolute and unconditional right . . . to unilaterally terminate . . . [the Settlement] for any reason whatsoever following notice of Opt Outs and prior to the Fairness Hearing." Settlement §16.1. Under this provision, the NFL Parties had the opportunity to reassess their participation in the Settlement after they learned the number of timely opt-outs. The "importance of accurately calculating initial opt-outs" weighs against a finding of excusable neglect for late opt-out requests. *In re Diet Drugs*, 92 F. App'x at 894-95 (3d Cir. 2004). *See also In re Dvi, Inc. Secs. Litig.*, No. 03-5336, 2016 WL 1182062, at *8 (E.D. Pa. March 28, 2016) (finding that allowing a late opt-out would prejudice defendants because

---

[9] While Martin's position may be somewhat unique in that she is a Derivative Claimant who cannot recover under the Settlement because the Retired Player her claim relates to timely opted out, this does not weigh in favor of allowing her to opt out at this late date. Martin does not suggest to the Court that she was unaware or her ex-husband's opt-out status at any point. Even if Martin was unaware of her ex-husband's intent to opt out and could not make a fully informed decision as to whether she should opt out before the deadline, Martin could have learned of her ex-husband's opt-out status on November 3, 2014, when the Claims Administrator filed the list of timely opt-outs on ECF. If Martin had made her request at that point, immediately after she learned that her ex-husband opted out, she might have a stronger case for excusable neglect. *Cf. In re Ins. Brokerage Antitrust Litig.*, 374 F. App'x 263, 266 (3d Cir. 2010) (affirming a district court's decision to extend an opt out deadline where the moving party "filed their motions with all possible haste after receiving actual notice of the Settlement Agreement . . . ."). At this point, however, four years have passed since Martin could have learned of her ex-husband's opt-out status.

"the opt-out deadline . . . was a negotiated, express term of [the class settlement] by which Defendants sought to achieve finality").

## 2. Reason for the Delay

When considering the reason for the delay and whether it was within the reasonable control of the movant, courts look to both "the conduct of the claimant which contributed to the delay" and to whether the notice provided contributed to the delay. *In re Orthopedic Bone Screw*, 256 F.3d at 328. Martin does not argue that she did not receive actual or constructive notice of the opt-out deadline. Rather, the only reason Martin gives for her delay is her mistaken understanding that, despite not filing a timely opt-out request, she was considered an opt-out by the Court.

That Martin had notice of the opt-out deadline weighs against a finding of excusable neglect. Martin has had a case pending in the NFL Concussion MDL since June 29, 2014, before preliminary approval of the Settlement and the beginning of the opt-out period. Martin has been continuously represented since this time, and her counsel entered an appearance on ECF. *See also* CMO Order 1, ECF No. 4 (*NFL Concussion MDL*) (instructing all attorneys with cases in the MDL to register to file on ECF). The preliminary approval order (ECF No. 6084), the Settlement itself (ECF 6087), the Summary and Long Form Notices (ECF No. 6093), and the list of timely opt-outs (ECF No. 6340) were all posted on ECF. Martin's status as a party in the MDL during this period means she almost certainly had actual notice of the opt-out requirements.[10]

---

[10] To the extent Martin's failure to timely opt-out was due to her attorney's failure to monitor the docket or otherwise stay apprised of developments in the NFL Concussion Litigation, clients are "held accountable for the acts and omissions of their attorneys." *Pioneer*, 507 U.S. at 396.

In addition, an extensive notice program took place during the opt-out period, and this weighs against excusable neglect. *See In re Diet Drugs*, 92 F. App'x at 894 (finding that "an elaborate and extensive plan of notice . . . to class members" weighed against excusable neglect). *Cf. Pioneer*, 507 U.S. at 398 (finding an untimely bankruptcy claim was due to excusable neglect when the notice provided contained a "dramatic ambiguity"). The extensive notice program for the Settlement was found to comply with all due process requirements by both this Court and the Third Circuit. *See supra* Section I(B-C). The class action litigation and the Settlement itself also received widespread media coverage. In addition, as discussed above, *see supra* Section III(A)(2), this notice made clear that the duty to opt out was one borne by each *individual* Class Member.[11] Nothing in the notice materials suggested that Derivative Claimants were relieved from this duty. The Notice materials also provided resources for Class Members with questions about the Settlement, including a toll-free hotline and contact information for class counsel. If Martin or her counsel were confused about how the opt-out requirement applied to Martin, they could have sought clarification from the hotline, the Settlement website, or class counsel. Martin has given no suggestion that she ever did so.

Martin's confusion about her opt-out status, standing alone, is not enough to support a finding of excusable neglect. Although "'excusable neglect'. . . is not limited strictly to omissions caused by circumstances beyond the control of the movant," "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute excusable neglect." *Pioneer*, 507 U.S. at 392. *See also Imprelis Herbicide Mktg.*, 2014 WL 348593, at *5 (finding that this factor weighed "heavily" against excusable neglect where the plaintiff's only reason for the delay was that "it believed that [the defendant] understood its intention to opt out").

---

[11] As a Class Member, Martin was subject to the same individual opt-out requirement as her ex-husband, who timely filed an effective opt-out notice.

Here, Martin received notice of the Settlement rules, including the opt-out deadline, and has given no reason for her four-year delay other than her "mistakes construing the rules." She has pointed to no circumstances outside her control that contributed to her failure to timely opt out. Instead, Martin contends that she failed to timely opt out of the Settlement solely because she was under the mistaken belief that she did not personally have to opt out. This factor weighs against a finding of excusable neglect

### 3. Length of Delay

The length of the delay here—four years—certainly weighs against a finding of excusable neglect. Courts have routinely declined to find excusable neglect for movants who ask for an extension considerably less than four years after a deadline. *See, e.g., In re Painewebber L.P.s Litig.*, 147 F.3d 132, 136 (2d Cir. 1998) (no excusable neglect for a nine-month delay); *Anwar v. Fairfield Greenwich Ltd.*, 315 F.R.D. 638, 640 (S.D.N.Y. 2016) (no excusable neglect for two-month delay); *In re Bank of America Corp. Secs., Derivative, and ERISA Litig.*, No. 10 Civ. 2284(PKC), 2013 WL 2443748, at *7 (S.D.N.Y. June 5, 2013) (no excusable neglect for a ten-month delay); *Klein v. O'Neal, Inc.*, No. 7:03-CV-102-D, 2009 WL 1174638, at *4 (N.D. Tex. April 29, 2009) (characterizing a 14-month delay in requesting to opt out as "substantial").

### 4. Good Faith

Finally, the Court does not question that Martin's misunderstanding of the opt-out requirements and her present request are in good faith. It is unfortunate for Martin, who has been continuously represented by counsel, that the Court must attribute the mistaken assumption that she did not need to individually opt out for the past four years to her.

Nonetheless, because of the prejudice to the Chiefs and the other NFL Defendants if Martin was allowed to opt out four years after the deadline, and because the only reason given

for the delay is Martin's misunderstanding of the opt-out requirement, the Court finds that Martin's failure to timely opt out was not due to excusable neglect. Martin's request to opt out will be denied.

## C. **Martin's Claim Was Released by the Settlement and Her Current Suit is Barred by Res Judicata**

The Chiefs argue that the Settlement bars all claims of non-opt-out Class Members, including Martin, against the NFL Parties for injuries arising from head concussions. The Chiefs are correct. Because Martin is a Class Member who failed to opt out, *see supra* Section III(A), and because she brings a loss of consortium claim for injuries arising from her ex-husband's alleged head injuries experienced during his time playing for the NFL, her claims are squarely within those released by the Settlement. The Settlement thus precludes her claim.

Claim preclusion may be adjudicated on a motion to dismiss under Rule (12)(b)(6). *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). Where there are no factual disputes, and where a district court is deciding whether a present action is precluded by another action previously adjudicated by that same court, claim preclusion may afford the basis for a Rule 12(b)(6) dismissal. *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 280 (3d Cir. 2016). A district court deciding a motion to dismiss based on claim preclusion may also take judicial notice of a prior proceeding between the parties. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988). *See also Hoffman*, 837 F.3d at 280 n.52 (noting that matters of public record can be considered on a motion to dismiss and collecting cases). Here, the Settlement is both a prior proceeding adjudicated by this Court and a matter of public record. Because I can determine whether Martin's claim is precluded by looking only to Martin's

Complaints and to the Settlement, it is proper to consider claim preclusion on a motion to dismiss.

Claim preclusion bars a plaintiff's claim when there has been: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Duhaney v. Attorney Gen.*, 621 F.3d 340, 347 (3d Cir. 2010) (internal quotation marks omitted). "It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action. This is true even though the precluded claim was not presented, and could not have been presented, in the class action itself." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001). Applying res judicata and claim preclusion as a consequence of class action settlement agreements "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action." *Id.* (internal quotation marks omitted).

The NFL Concussion Settlement was a final judgment on the merits. *See Rein v. Providian Fin. Corp.*, 270 F.3d 895, 903 (9th Cir. 2001) ("A judicially approved settlement agreement is considered a final judgment on the merits."). *See also Toscano v. Conn. Gen. Life Ins. Co.*, 288 F. App'x 36, 38 (3d Cir. 2008) (same). Additionally, both parties in this action were parties to the Settlement: Martin as a Class Member, and the Chiefs as a named party. *See* Settlement Agreement Section 2.1(bbbb)(ii) (including all past or present "Member Clubs" in the definition of "Released Parties).

The only remaining issue is whether Martin's action against the Chiefs and the Settlement are the same cause of action. The "bounds of preclusion after a settlement" are determined by the "express terms of a settlement agreement, not merely the terms of the

judgment." *Toscano*, 288 F. App'x at 38. *See also In re Prudential*, 261 F.3d at 366 (examining the text of a settlement release to determine its claim preclusive effect). In applying a settlement for preclusive effect, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action . . . ." *TBK Partners Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982). *See also Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 579 (3d Cir. 2011) ("The key inquiry is whether the factual predicate for future claims is identical to the factual predicate underlying the settlement agreement.").

The Settlement release plainly encompasses Martin's claims. It released all claims that "could have been asserted in the Class Action Complaint or any other Related lawsuit," and explicitly released claims arising out of or related to head injuries, claims arising out of or related to CTE, and claims for loss of consortium. Settlement §§ 18.1(a)(ii-iv). Both Martin's original Complaint and her Short Form Complaint allege these precise claims: that her ex-husband "suffered multiple concussive and sub-concussive injuries," that "Defendant's wrongful conduct . . . directly cased [sic] or directly contributed to cause Mr. Martin to develop [. . . CTE]," and that "[a]s a result . . . [Martin] suffered a loss of consortium." State Ct. Compl. at ¶¶ 2-4, ECF No. 1-1 (*Martin*); Short Form Compl. at 1-2, ECF No. 4 (*Martin*). The cause of action Martin asserts is one of the causes of action released by the Settlement. In addition, the factual predicate to Martin's claims is identical to the factual predicate underlying the settlement agreement: whether the NFL Parties knew of the risks created by concussive and sub-concussive head injuries, failed to take reasonable action to protect players from those risks, and fraudulently concealed those risks from players.

Although the Settlement's release is broad, it was approved by this Court and the Third Circuit. *See also Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 494 (3d Cir. 2017) ("It is not

unusual for a class settlement to release all claims arising out of a transaction or occurrence."). It is consistent with other broad releases given preclusive effect by the Third Circuit. *See, e.g. In re Prudential*, 261 F.3d at 367; *Grimes v. Vitalink*, 17 F.3d 1553, 1562 (3d Cir. 1994).

Allowing Martin's suit to proceed would be allowing the "relitigation of settled question at the core" of the NFL Settlement. Because Martin's claim is precluded by the Settlement,[12] I will grant the Chiefs' Motion to Dismiss.

## IV.    CONCLUSION

Martin is a Settlement Class Member who did not effectively opt out of the Settlement, and her failure to timely opt out was not due to excusable neglect. Because her claim is squarely within the scope of the Settlement's release, her claim is barred by claim preclusion. For the above reasons, Martin's Motion to Opt Out will be denied, and the Chief's Motion to Dismiss Martin's claim will be granted.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on:  1/3/2019

---

[12] This Opinion makes no statement as to whether Martin can make a valid claim against Christopher Martin under Missouri law, or any other applicable state law.